UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHEILA D. GRAY,

                        Plaintiffs,            Civil Action No. 18-12146
                                             Honorable Mark A. Goldsmith
v.                                     Magistrate Judge David R. Grand

CITY OF DETROIT,
a municipal corporation,

                        Defendant.
_____/

## AMENDED REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANT CITY OF DETROIT'S MOTION FOR SUMMARY JUDGMENT [26]

Before the Court is Defendant City of Detroit's ("City") Motion for Summary Judgment which was filed on June 21, 2019. (ECF No. 26.) Plaintiff Sheila D. Gray ("Gray") filed a response to the City's motion on July 26, 2019 (ECF No. 31), and the City filed a reply on August 1, 2019. (ECF No. 33.)

An Order of Reference was entered on August 3, 2018, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b). (ECF No. 10.) The Court heard oral argument on September 17, 2019, and the parties then filed supplemental briefs. (ECF No. 37; No. 38.)

## I.     RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the City's Motion for Summary Judgment (**ECF No. 26**) be **GRANTED IN PART AND DENIED IN PART**.

## II.     REPORT

### A.     Background

Plaintiff Sheila Gray worked for the Detroit Police Department from November 15, 1999, through November 9, 2016. (ECF No. 26, PageID.130-133; ECF No. ECF No. 7, Page ID.28-35.)

In 2006 she suffered an injury to her knee, which, after a lengthy dispute resolution process, was determined to have been an "on duty" injury. Gray went on restricted duty status effective February 28, 2011, due to her knee. (ECF No. 26-3, PageID.496.)

She was then placed at the Records and Identification Unit (sometimes referred to as "Ident.") at the Third Precinct – a facility where officers handle clerical assignments, like fingerprinting, background checks, and sex offender registration. (ECF No. 36-1 ("Gray dep.") at 35).[1] Gray knew these "restricted duty" positions were not "permanent" and instead are "used as an accommodation to allow the officer to rehabilitate and hopefully return to their command as an active duty officer." (*Id.*, at 26-27; ECF No. 37-2, PageID.1265.) Accordingly, after being placed at Ident., Gray put in annual requests to remain there in a "permanent" capacity, with her last request being made on February 15, 2015. (Gray dep., at 26-29, 77; ECF No. 26-6.) Two other employees – Charles Barnes (white male) and Carole Furstenau (white female) secured permanent Ident. positions, and Gray alleges those placements were discriminatory against her based on her race. (Gray dep., at 107-08.) While the record is not entirely clear as to the specific dates of those placements, Gray alleges that Barnes and Furstenau were "permanently transferred into Ident. in 2015." (ECF No. 31, PageID.593, 610-11.) While Gray never received a "permanent" Ident. position, she remained in her position at Ident. from the time she was first placed there in early 2011 through November 9, 2016, when she retired.

Gray experienced numerous work problems in the interim at Ident. She experienced stress

---

[1] Gray alleges that this position was given to her to accommodate her restrictions from "prolonged sitting, standing, or walking", but she provides no evidence that a doctor imposed these restrictions at this time. (ECF No. 7, PageID.31.) Indeed, the medical evidence Gray supplied from that time simply indicates that she would experience "limitation of mobility (left knee) intermittently," that she would need time off work only "when exacerbation occurs," and that she was "able to work when she does not have flare up." (ECF 31-1, PageID.753-55.)

at work for which she sought medical treatment.  (ECF 36-1, PageID.1036-1043.)  In 2015, the Ident department moved locations to the Detroit Detention Center.  (Gray dep., at 68).  This was a larger facility, and required Gray to sometimes stand at the counter during the day, and then walk from the counter to a file area to retrieve files.  (*Id.*).  According to Gray, this involved "a lot of walking" and "a lot of standing," and thus "went against [her] duty restrictions."  (*Id.*).  However, a doctor's note from January 2015 contained no specific functional restrictions, but merely limited Gray to "light duty."  (ECF No. 31-1, PageID.781.)

In October of 2015, Gray filed an internal complaint against co-worker Andre Sigmon regarding an incident that occurred between the two in the workplace on October 17, 2015.  (Gray dep., at 83-88.)  According to Gray, she was working at a particular computer, and Sigmon entered the room and turned off her computer so that he could use it.  (*Id.*)  Gray admits that she had no idea what caused Sigmon to behave in that manner, but importantly, she did not testify that it was on account of her race, sex, or disability.  (*Id.*)  After Gray reported the incident to her supervisor, Sergeant Carlos Dennis, he recommended that Sigmon be given a written reprimand.  (ECF No. 26-11.)  Sigmon was in fact reprimanded for failing to "use command of temper" and "to show courtesy" to a co-worker.  (ECF No. 38, PageID.1387.)

A number of months later, in the summer of 2016, Gray went on Family and Medical Leave Act leave due to mental health issues, and was scheduled to return on August 1, 2016.[2]  (ECF NO. 36-1, PageID.1043.)  On August 3, 2016, Gray's doctor issued restrictions as to her physical limitations, indicating that she could perform "light work," but could not walk for "prolonged" distances, and could not stand for "prolonged" periods.  (ECF No. 36-1, PageID.1044.)  The doctor

---

[2] It appears that Gray actually returned to work on August 2, 2016, and the Court will use that date. (Gray dep. at 37-38; ECF No. 36-1, PageID.1041; ECF No. 31, PageID.594.)

also found that Gray could sit for an hour at a time, but then was required to "be up" for 10-15 minutes before sitting again.  (*Id.*)

Gray alleges that upon her return from that leave, her supervisor, Sergeant Dennis, subjected her to different terms and conditions of employment based on her race, sex, and disability, and retaliated against her for having filed the complaint against Sigmon.  (ECF No. 36-1, PageID.1205.)  Among other allegations, Gray claims that Dennis moved her work station to the back of the office and assigned her to work the counter, which caused her to have to walk and stand more than her restrictions allowed.  (ECF No. 7, PageID.30; ECF No. 31-1, PageID.741-742, 772-776.)  Gray also claims that other employees began to treat her in a hostile manner and tried to sabotage her work.  (*Id.*)

Gray testified that as a result of these actions, she "was forced to retire . . . where the environment was so hostile and demeaning and disgrading [sic], [she] wasn't able to take it no more."  (Gray dep., at 110.)  On September 23, 2016, Gray applied for retirement due to an alleged "permanent disability."  (ECF No. 36-1, PageID.1225.)  While Gray alleges in this lawsuit that her retirement resulted from her inability to work in the "hostile environment" she describes, her application for permanent disability was based *solely* on her knee impairment and alleged inability to walk.  (*Id.*)  Specifically, when asked to give the "full explanation of the nature and causes of your disability," Gray answered:

> Severe degenerative arthritis in my left knee and [cyst] it causes pain and swelling in my whole leg.  Over the years my injury to my right leg has worsen[ed] due to overworking it . . .  My condition is permanent and at times I can't walk at all . . .

(*Id.*)

A few weeks later, Gray was evaluated by Dr. Melvin C. Murphy, M.D.  (ECF No. 31-2, PageID.794-97.)  On a form provided by the City, Dr. Murphy found that Gray was "permanently

4

incapacitated" and that she was unable to perform twelve of the twenty four "essential functions" of a City of Detroit Police Officer.  (*Id.*)[3]  Thereafter, the City granted Gray's retirement application, specifically finding that it was her knee condition that disabled her, and her last day of work was November 9, 2016.  (ECF No. 26-13.)

After some sort of "correspondence" to the EEOC in June 2017, and again on September 21, 2017, *see infra* at 11-13, Gray filed a formal EEOC complaint on September 27, 2017, alleging disability, race and sex discrimination, stating:

> On or about October 17, 2015, I filed a hostile work environment complaint against my co-worker [Sigmon].  From approximately June 2016 until September 2, 2016[4] I was out on leave.  **When I returned** from my leave my supervisor subjected me to different terms and conditions of employment based on my race (African American) and sex (female) and retaliated against me for having filed my complaint by moving my work location making my known disability worse.  Then on November 9, 2016 I was forced to retire.  I feel I was forced to retire in retaliation for having made [m]y complaint against my coworker [Sigmon].
>
> I believe I have been discriminated against on the basis of my . . . disability by . . . having my work location moved . . .

(ECF No. 36-1, PageID.1205.) (emphasis added)

After the EEOC investigated and found that it could not substantiate a violation of law occurred, it issued a right to sue notice on April 9, 2018, advising Gray that she could "file a lawsuit against [the City] under federal law based on this charge in federal or state court" within 90 days.  (ECF No. 36-1, PageID.1206.)  Gray then filed suit in this Court on July 9, 2018, and

---

[3] Gray does not dispute that, in light of her knee condition and related restrictions, she was unable to perform all 24 essential functions of a City police offer as defined in the City's "Essential Job Functions of a Law Enforcement Officer" form (the "Essential Functions Form").  (ECF No. 31-2, PageID.795-97; Gray Dep., p. 99-106.)

[4] This date appears to be an error, as the evidence shows that Gray returned to work on August 2, 2016.  *See supra* at 3 n.2.  Similarly, while it is worth noting that the EEOC complaint identifies the "earliest" date when the alleged discrimination took place as "September 2, 2016," this, too, relates to the date when Gray returned from leave – August 2, 2016.  (ECF No. 36-1, PageID.1205.)

filed an amended complaint on July 27, 2018, asserting the following claims:

- Counts I and III – violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et eq.* and the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), M.C.L. § 37.2101 *et. seq.*, by subjecting Gray to disparate treatment and harassing her because of her disability, failing to accommodate her disability, and retaliating against her for filing complaints about that treatment;

- Counts II and IV –violation of Title VII, 42 U.S.C. § 2000e, *et seq.* and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L.§ 37.2101 *et seq.*, by discriminating against Gray because of her race and sex, and retaliating against her for filing complaints about that discrimination.

(ECF No. 7.)  With discovery having closed, the City now moves for summary judgment as to all of Gray's claims, arguing that she failed to exhaust her administrative remedies, failed to prove a prima facie case of discrimination on any basis, and failed to raise a material question of fact as to her failure to accommodate claim.  (ECF No. 26.)

### B.      The Applicable Legal Standards

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).  The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment bears the initial burden of informing the court of the

basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)).  Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).  "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

### C.    Analysis

#### 1.    Timeliness of Gray's EEOC Complaint

The City first argues that Gray's claims fail because she did not timely file her claim with the EEOC.  (ECF No. 26, PageID.136-37.)  This particular argument is only persuasive as to Gray's claim that she was subjected to racial and sexual discrimination when the City, in 2015, placed Barnes and Furstenau in permanent Ident. positions instead of Gray.

Very recently, the Honorable Gershwin A. Drain explained the exhaustion process for claims brought under Title VII and the ADA:

Under Title VII, a claim for discrimination can proceed in federal district court only after administrative remedies are exhausted.  42 U.S.C. § 2000e-5(e); *Mitchell v. Chapman*, 343 F.3d 811, 820 (6th Cir. 2003). "It is well settled that a plaintiff must satisfy two prerequisites before filing a Title VII action in federal court: (1) timely file a charge of employment discrimination with the EEOC; and (2) receive and act upon the EEOC's statutory notice of the right to sue."  *Granderson v. Univ. of Michigan*, 211 F. App'x 398, 400 (6th Cir. 2006).  The EEOC charge "shall be in writing under oath or affirmation and shall contain such information and be in such form as the [EEOC] requires."  42 U.S.C. § 2000e-5(b).  The charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of.  29 C.F.R. § 1601.12(b); *Williams v. CSX Transp. Co.*, 643 F.3d 502, 508 (6th Cir. 2011).

An employee seeking to bring a claim under the ADA must also first exhaust administrative remedies.  *Jones v. Natural Essentials, Inc.*, 740 F. App'x 489, 492 (6th Cir. 2018).   Analogous to Title VII, to properly exhaust administrative remedies under the ADA, a plaintiff must file a charge of discrimination within 300 days of the alleged discrimination.  42 U.S.C. § 12117 and *Sherman v. Optical Imaging Systems, Inc.[,]* 843 F. Supp. 1168, 1180-81 (E.D. Mich. 1994).

*Stevens v. Concentrix Corp.*, No. 19-11530, 2019 WL 6728362, at *4 (E.D. Mich. Dec. 11, 2019).

The law differentiates between "distinct" claims of discrimination that accrued on a particular date and claims of ongoing discrimination that amount to a "hostile environment." While the former must be brought within 300 days of the particular discriminatory act, hostile environment claims must be brought within 300 days of the last related act:

The "continuing violations" doctrine allows courts to toll limitation periods for alleged discriminatory conduct that is deemed continuing in nature. Under the "continuing violations" doctrine, where "there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." []  "To establish a continuing violation, plaintiff must first produce evidence of a current violation taking place within the limitations period. Second, plaintiff must show that the current violation ... is indicative of a pattern of similar discriminatory acts continuing from the period prior to the limitations period." []

*In Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), a Title VII action, the majority opinion written by Justice Thomas emphasized the clear distinction between applying the

> continuing violations doctrine to "hostile environment claims" and applying
> it to "discrete claims of discrimination or retaliation." As held in *Morgan*,
> "[e]ach incident of discrimination ... constitutes a separate actionable
> 'unlawful employment practice'. [Plaintiff] can only file a charge to discrete
> acts that occurred within the appropriate time period." In other words, when
> an employee seeks redress for discrete acts of discrimination or retaliation,
> the continuing violation doctrine may not be invoked to allow recovery for
> acts that occurred outside the limitations period.

*Brown v. Donahoe*, No. 2:10-CV-12374, 2012 WL 2115180, at *3 (E.D. Mich. June 11, 2012)
(internal citations omitted), aff'd sub nom. *Brown v. Potter*, 516 F. App'x 563 (6th Cir. 2013).

> a. *Gray's Race and Sex Discrimination Claims Based on the City's
> Selection of Other Officers for "Permanent" Identification Unit
> Positions*

As discussed above, one of Gray's claims is that the City discriminated against her when
it placed Barnes (white male) and Furstenau (white female) in permanent Ident. Unit positions
instead of her. These are specific employment hiring decisions that constitute "discrete claims of
discrimination." *Morgan*, 536 U.S. at 114 ("Discrete acts such as termination, failure to promote,
denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each
retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment
practice.'"). "Each discrete discriminatory act starts a new clock for filing charges alleging that
act. The charge, therefore, must be filed within the [] 300–day time period after the discrete
discriminatory act occurred." *Id.*, at 113.

Here, Gray admits that the City's selection of Barnes and Furstenau instead of her occurred
in 2015. (ECF No. 31, PageID.593, 610-11.) Accordingly, Gray was required to file a charge of
discrimination about those discrete acts of alleged discrimination within 300 days, or by
approximately the end of October 2016, at the latest. It is undisputed that Gray did not do so, as
the earliest date she filed her EEOC charge was June 29, 2017. *See infra* at 11-12. The City is
therefore entitled to summary judgment as to Gray's claims based on Barnes and Furstenau being

selected for permanent Ident. positions.[5] [6]

> b.  *Gray's Other Race, Sex, and Disability Discrimination Claims*

A different analysis applies to Gray's other claims of race, sex, and

discrimination, which all involve claims by Gray that she was subjected to repeated and pervasive

instances of race, sex and disability discrimination over a lengthy period of time, and which

allegedly resulted in Gray being "forced" to retire on November 9, 2016.  As the U.S. Supreme

Court explained in *Morgan*:

> Hostile environment claims are different in kind from discrete acts.  Their
> very nature involves repeated conduct.   []  The "unlawful employment
> practice" therefore cannot be said to occur on any particular day.  It occurs
> over a series of days or perhaps years and, in direct contrast to discrete acts,
> a single act of harassment may not be actionable on its own.
>
> * * *
>
> Given, therefore, that the incidents constituting a hostile work environment
> are part of one unlawful employment practice, the employer may be liable
> for all acts that are part of this single claim. In order for the charge to be
> timely, the employee need only file a charge within 180 or 300 days of any
> act that is part of the hostile work environment.

*Morgan*, 536 U.S. at 115-118.

---

[5] This discrete claim is also subject to dismissal because it arose prior to her return to work on
August 2, 2016.  *See infra* at 13-14.

[6] In her summary judgment response brief, Gray asserts that an African American male employee,
John Hall, was also placed into a permanent Ident. position.  (ECF No. 31, PageID.611.)  However,
Gray fails to raise a material issue of fact as to Hall.  First, when discussing the issue of the
permanent Ident. positions in her complaint, Gray referenced only "white male and female co-
workers" as comparators.  (ECF No. 7, PageID.38.)  Similarly, when asked at her deposition how
she was discriminated against on the basis of race, Gray responded by pointing to Furstenau's and
Barnes' alleged permanent Ident. placements.  (Gray dep., at 107-08.)  However, when, in the very
next set of questions Gray was asked, "how is it that you were discriminated against based on your
sex," she did not mention Hall's alleged permanent Ident. placement.  (*Id.*, at 108.)  Indeed, Gray
has provided no evidence whatsoever about Hall's alleged permanent Ident. placement, and her
mere reference to that placement in her summary judgment response brief does not constitute
evidence which can form the basis for a material question of fact.  *See Veeder v. Tri-Cap*, No. 17-
cv-11690, 2018 WL 7254610, at *8 (E.D. Mich. Dec. 13, 2018).

The record indicates that Gray's last day of work was November 9, 2016.  (ECF No. 26-13, PageID.564.)  This means the latest possible deadline for Gray to file her EEOC complaint was September 5, 2017.  The City argues that because Gray filed her EEOC complaint on "September 27, 2017," it was tardy, and that she therefore failed to exhaust her claims.  (ECF No. 26, PageID.136 (citing ECF No. 36-1, PageID.1205.))

While it is true that Gray filed her ultimate EEOC Charge of Discrimination on September 27, 2017, the City's argument ignores that that filing appears to have supplemented prior related EEOC filings by Gray "between June 29, 2017 and September 21, 2017" that the EEOC deemed to be a timely "charge" of employment discrimination, a construction supported by the EEOC's September 21, 2017 letter to Gray, which read:

> Dear Ms. Gray:
>
> This is in response to your correspondence you submitted between June 29, 2017 and September 21, 2017, in which you alleged employment discrimination by [the City].  The information indicates that the matter complained of is subject to Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990.
>
> The enclosed EEOC Form 5, Charge of Discrimination, was drafted as a result of the information you provided.  To enable proper handling of this action by the Commission you should:
>
> > (1)  Review the enclosed charge form, sign, date, have notarized and return.
>
> * * * *
>
> Since charges must be processed within the time limits imposed by law, please complete these steps within 30 days of the date of this letter.  **Failure to do so will result in the dismissal of your charge.**  Please note that the EEOC has complied with the law and has sent a Notice of Charge of Discrimination to [the City] indicating that you have filed a charge of discrimination.  We have not sent a copy of the unsigned charge at this time.  However, should you fail to return the signed charge of discrimination within 30 days of this letter the EEOC will send a copy of the unsigned charge to [the City], along with a copy of the dismissal notice.

11

(ECF No. 31, PageID.616.) (emphasis added)[7]

The EEOC's letter to Gray indicates that her claim was assigned EEOC Charge No. 471-2017-03424, but it is unclear when that file number was created. (*Id.*) In its reply brief, the City did not address the EEOC's reference to Gray having filed some sort of charging document on June 29, 2017,[8] which would have been well within the 300-day statutory period. It is, undisputed, however, that Gray filed her ultimate EEOC charging document on September 27, 2017, within the 30 days indicated in the EEOC's letter to her. (ECF No. 36-1, PageID.1205.)

In sum, at least based on the present record, a question of fact exists as to whether Gray timely exhausted her administrative remedies as to her hostile environment claims.

Moreover, "[a]s the Court of Appeals for the Sixth Circuit has explained, the administrative requirement of filing an EEOC charge is a precondition 'that, like a statute of limitation, is subject to waiver, estoppel, and equitable trolling." *See Crawford v. Knoxville Health Care Center, L.P.*, 2010 WL 2721481, at *2 (E.D. Tenn. 2010) (citing *Truitt v. County of Wayne*, 148 F.3d 644, 646 (6th Cir. 1998). Equitable tolling is "sparingly bestowed." *Graham-Humphreys*, 209 F.3d 552, 560 (6th Cir. 2000). A litigant seeking equitable tolling or estoppel "must come with clean hands."

---

[7] In another (undated) letter, the EEOC explained to the City, "Often the EEOC receives letters from potential charging parties that contain information which is minimally sufficient to file a charge of discrimination. By law, the EEOC is required to date stamp such a letter, assign an EEOC charge number to it, draft a basic charge of discrimination (Form 5) and mail it to the charging party to return the signed charge within 30 days of receipt of such charge." (ECF No. 36-1, PageID.1204.) The EEOC's two letters seem to belie the City's contention that it was the *timing* of Gray's September 21, 2017 submission "which would explain why initially the EEOC indicated the City did not have to take any action when it gave notification of the complaint." (ECF No. 26, PageID.136-37.) That is, it appears the reason the EEOC did not require the City to respond initially was because it was waiting for Gray to supplement the "charge" she already filed. Once she did that, the EEOC forwarded it to the City for a response.

[8] Gray asserts in her response brief that she first filed her EEOC charge on "July 28, 2017." (ECF No. 31, PagerID.596.)

*King v. Henderson*, 230 F.3d 1358, 2000 WL 1478360, at *5 (6th Cir. 2000). Even a one day extension is inappropriate unless there are "compelling equitable considerations." *Id*. There are five factors to consider when determining whether a claim can be equitably tolled: "(1) lack of notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement." *Truitt v. Cty. Of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998). Here, Gray has at least raised questions about whether the document(s) she submitted to the EEOC prior to the expiration of the 300-day filing period equitably toll the running of that deadline; Gray appears to have commenced her EEOC charge on June 29, 2017 – prior to the deadline – which shows diligence; the City does not allege that the additional few weeks before Gray's ultimate charge was filed prejudiced it; and Gray acted as directed in the EEOC's letter.

Accordingly, the City is not entitled to summary judgment as to Gray's hostile environment claims based on the timeliness of her EEOC charge.

### 2.  Claims Outside the Scope of Gray's EEOC Charge

Notwithstanding the foregoing analysis, this Court lacks jurisdiction to consider Gray's race, sex, and disability discrimination claims that arose prior to her post-medical-leave return to work on August 2, 2016 because they exceed the scope of her EEOC charge. A district court's jurisdiction to hear cases arising under the Title VII and the ADA is "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Oliver v. Titlemax*, 149 F. Supp. 3d 857, 863 (E.D. Tenn. 2016) (quoting *Johnson v. Cleveland City Sch. Dist.*, 344 Fed.Appx. 104, 109 (6th Cir. 2009)). "Therefore, a plaintiff may bring suit on an uncharged claim if it was reasonably within the scope of the charge filed[,]" or if the agency

discovers evidence of the discrimination relating to the uncharged claim while investigating plaintiff's charge.  *Id.* (citing *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir.1998)).  Here, the EEOC found no evidence of disability discrimination (ECF No. 36-1, PageID.1206.), and reviewing Gray's operative EEOC charge makes clear that many of her race, sex, and disability discrimination claims are not reasonably within the scope of the "charge filed."

As noted above, in her EEOC charge, Gray specifically asserted that the discrimination and retaliation occurred after she returned from medical leave on August 2, 2016.  (ECF No. 36-1, PageID.1205.)  The EEOC charge went on to note that August 2, 2016, was the "earliest" date when the alleged discrimination took place.  (*Id.*)  Accordingly, events which allegedly took place prior to August 2, 2016, are simply not reasonably with the scope of Gray's EEOC charge, and the City is entitled to summary judgment as to these particular claims.  *See* 42 U.S.C. §2000e-5(e)(1). This includes Gray's claims referenced in paragraphs 7 – 23 of her response brief arising out of alleged "sexual advances" by one of her supervisors in November 2010, and treatment she faced from her supervisor and colleagues prior to August 2, 2016.  (ECF No. 31, Page.ID 590-94.).

In sum, Gray's only race, sex, and disability discrimination claims that proceed to a substantive discussion on summary judgment are those that arose after she returned to work from her medical leave on August 2, 2016.  The Court now turns to a consideration of those claims.

### 3.   *Race and Sex Discrimination, Harassment, and Retaliation Claims*

#### a.   *The City is Entitled to Summary Judgment on Gray's Disparate Treatment Race and Sex Discrimination Claims*

Gray alleges that when she returned from her leave of absence, the City subjected her to different terms and conditions of employment based on her race and sex.  (ECF Nos. 36-1, PageID.1205; 26-12, PageID.559; *see also* ECF No. 7.)  As the City recognizes, Gray does not attempt to allege or prove that she suffered disparate impact discrimination.  Instead, her race and

sex discrimination claims are entirely founded on alleged disparate treatment.  To prove such a claim, the plaintiff must first establish a prima facie case of disparate treatment for race/sex discrimination by proving that: (1) she was a member of the protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was (a) replaced by someone outside the protected class, or (b) treated less favorably than similarly-situated persons outside the class.  *Ward v. A-1 Int'l Courier Serv., Inc.*, No. 05-72330, 2007 WL 325342, at *4 (E.D. Mich. Jan. 31, 2007) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582, 582 n. 4 (6th Cir.1992)).[9]  To be deemed "similarly-situated," the plaintiff must show that "all of the relevant aspects of [her] employment situation were nearly identical to those of [the compared employee's] employment situation."  *Mich. Dept. of Civ. Rights ex rel. Burnside v. Fashion Bug*, 473 Mich. 863, 869, 702 N.W.2d 154 (2005) (internal quotations omitted).

If the plaintiff can establish a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its challenged conduct.  If the defendant does so, the burden shifts back to the plaintiff to show that the reason offered was pretext. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1972); *Mitchell*, 964 F2d at 582 (1992).

Gray identifies a few employment decisions and conditions that she claims constitute unlawful race and/or sex discrimination.  Most are far too vague, and completely unsupported by any evidence, to give rise to a claim.  For example, Gray asserts in her response brief, (1) "Officer Melissa Adam a white female was able to go and come as she pleases and she received full medical treatment for (her finger injury)," and (2) "co-worker Officer Turner consumed alcohol a lot and would come into work and go to sleep on the floor [] [and] was operating his private business on

---

[9] The same prima facie elements apply to Gray's discrimination claims brought under the ELCRA. *See Lytle v Malady (On Rehearing),* 458 Mich. 153, 172-173; 579 NW2d 906 (1998).

the job . . ."  (ECF No. 31, PageID.610-11.)  But Gray offers no evidence to support these accusations, and the unsupported accusations in her response brief cannot raise a material question of fact at the summary judgment stage.  *See Veeder*, 2018 WL 7254610, at *8.

Gray also alleges that Daniel Emery, a white male, was allowed to go to physical therapy during the day, while she was not, and thus had to attend her physical therapy sessions on her own time.  (ECF No. 31, PageID.610-11.)  She also alleges that Emery was allowed to run errands for Dennis during the day, while she remained at her duty station.  (*Id.*)  It is unclear whether this treatment occurred during the relevant period (Gray dep., at 77-78), but even if it did, Gray still has failed to raise a prima facie case of discrimination.

While Gray and Emery were similarly situated in some respects – they were both City of Detroit police officers working on temporary restricted duty in the Identification Unit under Sergeant Dennis – Gray fails to show that she and Emery had the same medical restrictions. Moreover, Sergeant Dennis provided an affidavit in which he avers that Emery was allowed to attend physical therapy during the day because he had "gone through the proper procedures within the medical section," while Gray "did not go through the proper process and wanted to go to a doctor which had not been approved by the medical section."  (ECF No. 26-5, PageID.520.) Dennis concludes, "Because it wasn't sanctioned by the medical section, I did not release [Gray] to go to the therapy" during worktime hours.  (*Id.*)  Gray presented no evidence showing that Dennis' proffered reasons were pretext, and thus she has failed to raise a material question of fact as to this issue.

The only other specific allegation of disparate treatment raised by Gray is in connection with Charles Barnes (white male) and Carole Furstenau (white female) being placed into permanent Ident positions.  (ECF No. 31, PageID.610.)  However, as discussed above, *supra* at 9-

10, Gray's EEOC charge as to those discrete acts of alleged discrimination was untimely.  (ECF

No. 31, PageID.593, 610-11.)

For all of these reasons, the City is entitled to summary judgment on Gray's disparate

treatment race and sex discrimination claims.

> b.  *The City is Entitled to Summary Judgment on Gray's Racial and Sexual Harassment Claims*

To the extent Gray is claiming she was subjected to a racially or sexually hostile work

environment, that claim also fails.  Under Title VII and the ELCRA, racial and sexual harassment

are actionable offenses.  *Malan v. General Dynamics Land Sys*., 212 Mich. App. 585, 587 (1995);

*CBOCS West Inc. v. Humphries,* 553 U.S. 442 (2008).  To establish such a claim the plaintiff must

prove: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment;

(3) the harassment was race-based or sex-based; (4) the harassment unreasonably interfered with

her work performance by creating an environment that was intimidating, hostile or offensive; and

(5) the employer was liable for the harassing conduct.  *Clay v. United Parcel Serv., Inc.,* 501 F.3d

695, 706 (6th Cir.2007) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir.1999)).  However,

as the City correctly points out, Title VII and the ELCRA are not meant to be a general civility

code, ridding the workplace of petty slights and annoyances.  *See Faragher v. City of Boca Raton*,

524 U.S. 775, 787-88 (1998).  Rather, their purpose is to protect against severe and pervasive

harassment based on a protected characteristic.  *See id*.

Gray presents no evidence of overt racial harassment such as racial epithets being used in

the workplace, and she presents no other evidence that could be construed as creating a racially-

hostile atmosphere.  Gray has identified only one specific issues that could even potentially be

considered sexually harassing in nature.  She alleges a single incident when her supervisor told her

that because part of her job involved registering sex offenders, she needed to wear longer shirts

that would cover her buttocks.  (Gray dep., at 47.)  While Gray disputes wearing any inappropriate clothing, this single relatively benign comment does not rise to the level of actionable sexual harassment.  *Faragher*, 524 U.S. at 787-88.

Accordingly, the City is entitled to summary judgment on Gray's claims that she was subjected to racial and sexual harassment.

### c.  The City is Entitled to Summary Judgment on Gray's Retaliation Claims

In her complaint, Gray claims that she was retaliated against because she "opposed practices prohibited by Title VII [and the ELCRA]."  (ECF No. 7, PageID.37, 41.)  However, a careful review of the record shows that was not the actual basis of her retaliation claim.  Gray's EEOC charge unequivocally alleges that she was retaliated against "for having filed [her] complaint" against Sigmon, and Gray's testimony makes clear that her complaint had nothing to do with alleged discrimination in violation of Title VII or ELCRA.  (ECF No. 36-1, PageID.1205; Gray dep., at 83-88.)  Rather, Gray filed her complaint because Sigmon came into her workspace and turned off her computer so that he could use it, and Gray admits she has no idea why he acted in that unprofessional manner.  (Gray dep. at 83-88)  Thus, Gray presents no record evidence that her complaint against Sigmon had anything to do with her race or sex.  This dooms her Title VII retaliation claim.

To prove a prima facie case of retaliation under Title VII, the plaintiff must show: 1) that she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; 2) that her exercise of her protected rights was known to the defendants; 3) that she was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and 4) that there was a causal connection between the protected activity and the adverse employment action.  *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir.

18

1990).

As to the first element, the plaintiff is not required to show that she engaged in formal proceedings under Title VII. "Rather, an informal complaint to an employer concerning practices which are prohibited by Title VII is sufficient to constitute protected activity." *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 793–94 (S.D. Ohio 1998), aff'd, 194 F.3d 1315 (6th Cir. 1999) (citing *E.E.O.C. v. Romeo Community Schools*, 976 F.2d 985, 989 (6th Cir.1992)). However, "[c]omplaints concerning unfair treatment in general **which do not specifically address discrimination** are insufficient to constitute protected activity." *Weaver*, 71 F.Supp.2d 793-94 (emphasis added). This is because "[r]etaliation claims brought under Title VII must stem from alleged retaliation for activities protected under Title VII." *Leligdon v. McDonald*, No. 1:14 CV 2810, 2016 WL 10590098, at *14 (N.D. Ohio Nov. 21, 2016) (citing *Weaver*, 71 F.Supp.2d at 793-94 (S.D. Ohio 1998), aff'd 194 F.3d 1315 (6th Cir. 1999) and *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 520 (6th Cir. 2009)). Gray's Title VII retaliation claim fails this requirement as it arose not out of a report of "discrimination" but out of a report of an unpleasant interaction with a colleague.[10]

### 4.   *Disability Claims*

In her complaint, Gray makes a variety of claims related to her alleged disabilities – "bilateral degenerative arthritis in her knees as well as generalized anxiety and depression." (ECF No. 7.) Specifically, she alleges that the City "discriminated against [her] because of her disability

---

[10] Similarly, with respect to Gray's disability claims, to the extent she alleges she was retaliated against as a result of her complaint against Sigmon, the City is entitled to summary judgment, as Gray was required to show that she was retaliated against for engaging in activity "protected under the ADA" and the PDCRA. *Morrissey v. Laurel Health Care Co.*, No. 18-1704, 2019 WL 7043167, at *3–4 (6th Cir. Dec. 23, 2019); *Applewhite v. FCA US LLC*, No. CV 17-11132, 2019 WL 6894229, at *6 (E.D. Mich. Dec. 18, 2019).

by subjecting her to disparate treatment because of her disability"; "discriminated against [her] by

failing to provide reasonable accommodations to [her]"; "retaliated against [her] for requesting

accommodations and for opposing violations of the ADA [and the PDCRA]"; and "permitted its

employees to harass [her] because of her disabilities and failed to take prompt remedial action to

redress such harassment after [she] reported it." (*Id.*)  But many of those have nothing to do with

Gray's EEOC charge, in which she asserted:

> On or about October 17, 2015, I filed a hostile work environment complaint
> against my co-worker [Sigmon].  From approximately June 2016 until
> [August 2, 2016] I was out on leave.  When I returned from my leave my
> supervisor subjected me to different terms and conditions of employment
> based on my race (African American) and sex (female) and retaliated
> against me for having filed my complaint [against Sigmon] ***by moving my
> work location making my known disability worse.***  Then on November 9,
> 2016 I was forced to retire.  I feel I was forced to retire in retaliation for
> having made [m]y complaint against my coworker [Sigmon].
>
> I believe I have been ***discriminated against on the basis of my . . . disability
> by . . . having my work location moved*** . . .

(ECF No. 36-1, PageID.1205.)

Gray's charge thus makes clear that the only issue she raised about her disability was that

by moving her work location ***in early August 2016*** her "known" disability became worse.  While

that creates a potentially viable claim under the ADA and/or PDCRA (which the Court will analyze

below), it is a far cry from most of the disability claims Gray purports to bring in this civil action,

such as alleged long-standing failure by the City to accommodate her disabilities, persistent

"harassment" by other employees, and "retaliation" for complaining about alleged "violations of

the ADA."

A review of the chronology alleged in paragraphs 19-23 of Gray's response brief shows

that those "claims" all preceded her August 2, 2016 return to work and are unrelated to her office

move.  (*See* ECF 31, PageID.593-94.)  Thus, as discussed above, *supra* at 13-14, none of those

claims is "reasonably within the scope of" Gray's narrow and specific charge that Sergeant Dennis moved her workstation after she returned to work on August 2, 2016, and that such move worsened her disability.  (*Id.*, PageID.594.)  *Oliver*, 149 F. Supp. 3d at 863.  Accordingly, the City is entitled to summary judgment as to those other claims of disability discrimination that are not encompassed within Gray's EEOC complaint.

The Court thus turns to Gray's remaining claim about Sergeant Dennis moving her office after she returned from her medical leave.  In her response brief, Gray explained this claim as follows:

> 23.    When [she] returned back to work on ***August 2, 2016*** Supervisor Carlos Dennis called [her] on the office phone and told her to start working in [an] office [] in the back of the building.  He said Aloha Dodd is Pregnant and can't do a lot of [walking] so she needs her trainee in the room next to her.  (Record Removal Room)  When Plaintiff mentions her restrictions he said "he was ordering her to work in that office."  He also ordered her to work the counter which required a lot of walking and standing.

(*Id.*, PageID.594.) (emphasis added)  Later in her brief, Gray explained, "Sergeant Dennis knew of Plaintiff [sic] disability he knew that ordering her to work the counter would do a greater bodily harm to her. . . He gave her a Direst [sic] order and forced her to work in an area that wasn't close to material and the essential needed [sic] to do her job (example) fax machine, printer, live scan computer and other item.  He (Maliciously and with Malice further violated and went against her known job restrictions.)"[11]  (*Id.*, PageID.600.) (parenthesis in original)  In other words, Gray's

---

[11] Importantly, the restrictions that Gray seems to be referring to – that she "cannot walk for prolonged distances, cannot stand for prolonged periods, . . . sitting for one hour then must be up for 10-15 minutes before sitting again" – were not imposed until August 3, 2016 – the day *after* she returned to work from her medical leave.  (ECF No. 36-1, PageID.1044.)  Therefore, when Dennis moved her office on August 2, 2016, he necessarily could not have done so in violation of her "known" restrictions – at least not the ones imposed one day later.

claim seems to be that by requiring her to work in the "back" of the office and at the counter, Dennis failed to accommodate her disability.[12]

Very recently, the Sixth Circuit explained the standards applicable to disability claims like Gray's remaining failure to accommodate claim:

> The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on "direct" or "indirect" evidence of discrimination.  *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016).  This court has explained the logic behind this distinction as follows:
>
>> When an "employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision[,] the *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant[ ] and the plaintiff has direct evidence of discrimination on the basis of his or her disability."
>
> *Id.* at 892 (alterations omitted) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996)).  Direct evidence of disability discrimination "'does not require the fact finder to draw any inferences'" to conclude "that the disability was at least a motivating factor."  *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013)).
>
> Because "not making reasonable accommodations" is listed in the ADA's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination."  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).
>
> Under the direct framework, [the plaintiff] bears the burden of establishing (1) that she is disabled, and (2) that she is "otherwise qualified for the position despite his or her disability: (a) without accommodation from the

---

[12] Although Gray technically raised this office move in connection with her retaliation claim (ECF No. 36-1, PageID.1205) ("retaliated against me . . . by moving my work location . . .") that the Court has found is subject to dismissal, the substance of the allegation that the move violated her restrictions and worsened her condition is nevertheless "reasonably within the scope of the charge," and therefore properly before the Court.  *Oliver*, 149 F. Supp. 3d at 863.

> employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869 (citation and internal quotation marks omitted). Once the plaintiff has established these elements, the employer "bear[s] the burden of proving that ... a proposed accommodation will impose an undue hardship upon the employer." *Monette*, 90 F.3d at 1186.

*Morrissey v. Laurel Health Care Co.*, No. 18-1704, 2019 WL 7043167, at *3–4 (6th Cir. Dec. 23, 2019).[13]

One final principle must be highlighted. An "employer is not required to speculate as to the extent of [an] employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998). "Nor is it the employer's obligation to propose an accommodation—the employee must affirmatively request one." *Lowes v. Baldwin*, No. 2:18-CV-537, 2019 WL 7290504, at *11 (S.D. Ohio Dec. 30, 2019) (citing *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016); 29 C.F.R. pt. 1630 App. § 1630.9 (2016) ("[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.")). This is "because many disabled people do not need an accommodation, and the employee is in the best position to know how the disability impacts their work. Furthermore, the ADA generally prohibits employers from inquiring about a disability's severity." *Cady*, 665 F. App'x at 418. "Only once a disabled employee has requested the reasonable accommodation does the employer have the duty to make a reasonable effort to accommodate that employee." *Lowes*, 2019 WL 7290504, at *11 (citing *Gantt*, 143 F.3d at 1046–47).[14] Although there is "no bright-line test for when the form of an employee's request is

---

[13] Michigan's PDCRA also protects a person with a disability, defined as "an individual who has one or more disabilities." MCL § 37.1103(d)(i)(A). Although the PDCRA differs in some respects from the ADA, its relevant provisions, like the ADA, require that an employer accommodate a person with a disability unless the employer demonstrates that the accommodation would impose an undue hardship. MCL § 37.1210(2)-(6), (8)-(12), (14)-(15); *See Rourk v. Oakwood Hospital*, 458 Mich. 25, 32 (1998). Thus, the Court will address Gray's ADA and PDCRA claims together.

[14] Once an employer becomes aware of an employee's request for an accommodation, it must

23

sufficiently clear to constitute a request for an accommodation," *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014), and "an employee need not use the magic words 'accommodation' or even 'disability,' the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions." *Leeds v. Potter*, 249 Fed.Appx. 442, 449 (6th Cir. 2007).

Careful application of the relevant case law and legal standards to the record evidence shows that summary judgment is inappropriate on Gray's failure to accommodate claim.

### a.    Disabled

Gray has at least raised a question of fact as to the first element of her failure to accommodate claim – showing that she had a disability.  Under the ADA, a "disability" is defined in three ways: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).  For purposes of this definition, "major life activities" "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2).  The ADA further provides:  "(A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter; (B) The term 'substantially limits' shall be interpreted consistently with the

---

"make a reasonable effort to determine the appropriate accommodation."  29 C.F.R. pt. 1630 App. § 1630.9.   "The appropriate reasonable accommodation is best determined through a flexible interactive process that involves both the employer and the [employee] with a disability."  *Id.* Further, when an employee requests a reasonable accommodation, an employer must individually address the requested accommodation. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 782 (6th Cir.1998).

findings and purposes of the ADA Amendments Act of 2008; (C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability; and (D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4).

The City argues that Gray "had no problems performing clerical duties that were temporarily granted as an accommodation" and that "[t]he fact that she can work, albeit not in the position that she was hired for, shows she is not substantially limited."  (ECF No. 26, PageID.142.) However, the City cites no facts or case law in support of its argument, and ignores: (1) that during the relevant time in early August 2016, a doctor imposed new restrictions that Gray "cannot walk for prolonged distances, cannot stand for prolonged periods, . . . sitting for one hour then must be up for 10-15 minutes before sitting again"; and (2) just a few months later, Gray applied for and received permanent disability on account of her knee condition and its impact on her ability to walk.  (ECF No. 36-1, PageID.1044.)   At a minimum, this shows that Gray raised a material question of fact as to whether she was "disabled" during the relevant period.

### b.      Otherwise Qualified

Gray has also raised a question of fact as to whether she was "otherwise qualified" for her position: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation.  As to this issue, the City's argument presumes the analysis revolves around whether Gray could perform the "24 essential functions" of an active-duty police officer.  While Gray admits that she was unable to perform many of those functions, such as climbing over obstacles and chasing down suspects (Gray dep. at 99-106), this does not end the analysis because "a 'reasonable accommodation' under the ADA may include 'reassignment to a vacant position.'"  *Kleiber*, 485 F.3d at 869 (quoting 42

U.S.C. § 12111(9)(B)).  "[A]n employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified." *Id.* (alteration in original) (quoting *Burns v. Coca–Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)).

The City recognizes this principle (ECF No. 37, PageID.1255.), but, citing *Meade v. AT&T Corp.*, 657 F. App'x 391, 396 (6th Cir. 2016), asserts that it was not required to accommodate Gray by "creating" a permanent light duty position for her.  (ECF No. 37, PageID.1255.)  The problem with this argument, though, is that the City admits it had already put Gray into "a restricted duty position that did not require her to go out on patrol."  (ECF No. 26-12, PageID.557.)  While the City argues that this was done only as "a temporary accommodation," and contrasts this position with the "permanent" restricted duty positions that Gray applied for and did not receive (ECF No. 37, PageID.1255.), at least two facts call that argument into question: (1) Gray held the supposed "temporary" position for about 5½ years before the issue giving rise to her instant claim – Dennis' decision in August 2016 to move her office and assign her to the counter – occurred; and (2) Gray's employment ended not because the City eliminated her restricted duty position, but because Gray filed for disability retirement.  These facts amply distinguish Gray's case from *Meade*, in which the employer had initially accommodated an employee's temporary restrictions by allowing him to do light-duty tasks around the office which "was not part of a formal position within [the employer]," but "[u]pon learning that the [employee's] limitations would be permanent . . . refused to create a permanent light-duty position."  *Meade*, 657 Fed.Appx. at 392, 396.

In sum, given that the City maintained between 123-155 "restricted duty positions" during the time in question (ECF No. 26-12, PageID.561.), and that Gray held her restricted duty position

for almost 6 years, questions of fact exist as to whether Gray was "otherwise qualified" for the position she held at the time the alleged violation occurred in early August 2016.

<em>c.  Request for Accommodation</em>

Finally, as explained above, to state a prima facie case, Gray must show that she affirmatively requested an accommodation from the City. Construing the evidence in the light most favorable to Gray, as the Court must do at this stage of the litigation, it finds that she has raised a material question of fact as to this issue.

Gray returned to work from a medical leave on August 2, 2016, and Dennis then moved her workstation to the back of the office and assigned her to work the "counter" on at least some occasions. The very next day, Gray's doctor issued restrictions as to her physical limitations, indicating that she could perform "light work," but could not walk for "prolonged" distances, and could not stand for "prolonged" periods. (ECF No. 36-1, PageID.1044.) Gray provided evidence which at least raises a question of fact as to whether keeping her at the new work station and continuing to have her work the counter violated these restrictions.

First, Gray provided a video that showed the distance she had to walk from her new workstation to utilize basic office equipment, such as a fax machine and copier. While the distance itself was not terribly lengthy, it was appreciable enough that, if Gray had to make the walk often during the day, a factfinder could conclude she had to engage in "prolonged" walking. Certainly that finding could easily be made vis-à-vis the amount of walking she would have had to do if the fax machines, etc. were in vicinity of her office. The City contends this was a non-issue because Sergeant Dennis avers that, "[w]hile the fax/copier were up front, [Gray] did not have to go back and forth, she could have waited for a pile of work to be faxed or copied – like the Office

Management Assistant (Lewis) does now!"  (ECF No. 37-4, PageID.1290.)  But this merely raises a question about whether, to *effectively* do her job, Gray had to walk "prolonged" distances.

Second, Gray testified about the challenges she encountered in being assigned to work the counter.  For instance, she explained, that it "[s]till [involved] a lot of walking and standing because if you worked the counter, you still have to get the file.  They give you a file number. That file is not at the counter.  You have to go pull the index card.  You have to go pull the file. You have to walk up to the front of the building and make copies.  (Gray dep., at 68-69.)  She also explained that "there was no sitting at the counter."  (*Id.*, at 68.)  The City did not dispute Gray's characterization of the counter work.

Still, in order to establish a prima facie case, Gray must show that she requested a reasonable accommodation.  Although a close call, Gray has at least raised a material question of fact as to whether she satisfied this requirement.  It is unclear exactly when the August 3, 2016 restrictions were communicated to the City, but it appears that they were provided by the doctor to the City that same day, and the City does not contend it did not receive them.  It is also undisputed that Gray complained to at least two of her supervisors.  She presents evidence that she complained to Dennis right away when her workstation was moved about it resulting in her having to walk too much.  (ECF No. 31-1, PageID.742, 772.)  Dennis recognized Gray's communication as a request to "move" her and then, according to Gray, Dennis "called the medical section [himself] . . . and said i [sic] was having a problem with my work location . . ."  (*Id.*)[15]  Dennis

---

[15] Gray clearly should have called the "medical section" herself, instead of flippantly declining to do so (ECF No. 31-1, PageID.742, 772) ("I said why should i [sic] call the medical section i [sic] moved to the back like you said."), but her description of the events is consistent with the City's "Complaint Procedures," which state, "Any commanding officer or supervisor who becomes aware of any violation or possible violation, shall take immediate and appropriate corrective action, and may consult with the EEOC for further direction."  (ECF No. 36-1, PageID.1197.)  In its supplemental brief, the City states, "If [Gray's] restrictions were not being accommodated, and

does not dispute Gray's evidence, and there is nothing in the record to suggest that the City engaged in an interactive discussion with Gray about the specific issue.  Gray also presents evidence that she raised the issues at least one more time with a different supervisor, Braxton Hall, specifically referencing her "restrictions" in connection with difficulties being at her new "work location" and working at the "counter."  (ECF No. 31-1, PageID.742, 772.)  Again, the City does not dispute Gray's evidence, and there is nothing in the record to suggest that any sort of interactive discussion followed Gray's communication with Hall.

The only question then, is whether Gray's communications to Dennis and/or Hall rose to the level of a "request" for an accommodation sufficient to have triggered the City's obligation to engage in an interactive discussion with Gray about her concerns.  This is a close call because Gray was required to show that she requested a "specific accommodation," *Steward v. New Chrysler*, 415 Fed. Appx. 632, 642 (6th Cir. 2011), and her communications certainly could have been more specific.[16]  At the same time, Gray was not required to use any particular words to request an accommodation, which includes "making existing facilities readily accessible," *see* 42

---

she did not agree with Sgt. Dennis' assessment/response, she could have brought it to the attention of the Lieutenant in charge of the Unit, the Medical Section, Personnel or the Chief's Office. There's no evidence that she gave notice to anyone else or that she sought an alternative accommodation."  (ECF No. 37, PageID.1257.)  But the City's factual assertion is incorrect – Gray did advise a different supervisor, Braxton Hall about the issues, *see infra* at 29 – and the City cites no law that would render Gray's statements to her two supervisors ineffective in terms of triggering the City's obligation to engage in an interactive process.

[16] Questions exist, also, about the claim's overall merits.  Shortly before her August 2016 return to work (and move to the back of the office) a psychiatrist had performed a psychiatric evaluation of Gray.  When Gray told the psychiatrist that she had been "walking on a treadmill" for exercise, he "confront[ed] her about how she can walk on a treadmill if she has arthritis in her knees and can't walk around her office, and she [was] unable to explain this discrepancy."  (ECF No. 26-15, PageID.570.)  At the same time, Gray has presented her physician-imposed walking restrictions which are reasonably consistent with medical records stretching over a decade, and the Court may not weigh competing evidence in determining whether summary judgment is appropriate. *Anderson*, 477 U.S. at 249.

U.S.C. § 12111(9)(B); 29 C.F.R. § 1630(o)(2).  As shown above, Gray's comments to Dennis were clear enough that he understood she wanted a "move" so that she would not need to walk so much to access basic office equipment.[17]   Moreover, Gray's subsequent communication to Hall specifically referenced that issue, as well as her contention that working the "counter" violated her "restrictions."  Considered in a light most favorable to Gray, the Court finds that she did enough to request an accommodation – moving her office or providing her with office equipment – to trigger the City's obligation to engage in the interactive process.  *See Moore v. Hexacomb Corp.*, 670 F. Supp. 2d 621, 630 (W.D. Mich. 2009) ("What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and the desire for an accommodation.") (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir.1999)).  *See also Thompson v. E.I Dupont deNemours & Co.*, 140 F.Supp.2d 764, 774 n. 8 (E.D. Mich. 2001).

Accordingly, the burden shifted to the City to prove that Gray's proposed accommodation would have imposed an undue burden.  *Morrissey*, 2019 WL 7043167, at *4; 42 U.S.C. § 12111(10)(B).  Again, there is nothing in the record to suggest that the City even engaged with Gray regarding her request, and the City presented no evidence that moving Gray or providing her the necessary equipment would have caused it any burden.[18]  Accordingly, summary judgment on this claim is inappropriate.

---

[17] According to Gray, Dennis even stated that he had moved Gray so that a different employee who was pregnant could use her old space and not have to "do to [sic] much walking."  (ECF No. 31-1, PageID.772.)

[18] The City argues that "[t]he only accommodation [Gray] appears to want to work is a permanent position in the Identification Unit."  (ECF No. 37, PageID.1254.)  But, as shown above, at least during the timeframe the Court finds to be relevant, Gray was seeking a different accommodation.

## III.    CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that the City of Detroit's Motion for Summary Judgment (**ECF. No. 26**) be **GRANTED IN PART and DENIED IN PART**, with only Gray's failure to accommodate claim under the ADA and PDCRA, as described above, surviving.

Dated: January 7, 2020                              s/David R. Grand
Ann Arbor, Michigan                                 DAVID R. GRAND
                                                    United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 7, 2020.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
